UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

In re:

James Fredrick Price, III and
Teresa Wynn Price,

        Debtors.

Case No. 17-41442-JJR-13

MEMORANDUM OPINION AND ORDER

Case History and Facts:

James Fredrick Price ("JFP") and Teresa Wynn Price ("TWP") (together, the "Debtors") filed their joint chapter 13 petition on August 8, 2017, along with schedules, statement of financial affairs, and other related documents. (Doc. 1.)[1] Part 4, question 33 of their Schedule A/B asked if the Debtors owned any legal or equitable interest in any "Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment," and gave as an example, "rights to sue," with room for a description, to which they responded, "No." (Doc. 1 p. 14.) Similarly, in Part 4, question 9 of their statement of financial affairs, in response to the question, "Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?" the Debtors answered, "No." (Doc. 1 p. 43.) And in their original chapter 13 plan filed with their petition, no mention was made of any lawsuit or a possible recovery from a legal action. (Doc. 7.)

The Debtors scheduled 36 unsecured nonpriority creditors, holding claims totaling $87,837.78. (Doc. 1 pp. 20-33.) Forty-five creditors filed proofs of claim, five of which were

---

[1] Previously, the Debtors had each filed an individual chapter 7 case, JFP in 2012 and TWP in 1994, and JFP also filed a joint chapter 7 case with a prior spouse in 1990.

originally filed as secured. After surrender of a vehicle and of a mobile home and real estate, two of those claims were amended to unsecured and the balance deemed satisfied by the surrender in full satisfaction; 15 proofs of claim were withdrawn, and the trustee's objections to several others were sustained, resulting in 22 allowed nonpriority unsecured claims totaling $44,479.26

The meeting of creditors was held on September 8, 2017, pursuant to § 341(a) of the Bankruptcy Code (11 U.S.C. §101, *et seq.*, herein the "Code"), and shortly thereafter, on September 13, 2017, the Debtors amended their Schedule A/B by disclosing a transvaginal mesh lawsuit (the "Mesh Lawsuit") being pursued by TWP, which they valued at $4,000.00. (Doc. 32 p. 7.) They also amended their Schedule C claiming the total $4,000.00 value of the Mesh Lawsuit as exempt property. (Doc. 32 p. 10.)[2] They did not amend their proposed plan, which at that time would pay nothing to nonpriority unsecured creditors. (Doc. 7.)

On September 22, 2017, the standing chapter 13 trustee filed an objection to confirmation of the Debtors' original plan, complaining that the Debtors were "not … offering all of their disposable income in that potential lawsuit proceeds may need to be preserved and offered into the plan." (Doc. 39.) In response to the trustee's objection, the Debtors filed an amended plan, which provided in Part IV that "proceeds from the transvaginal mesh lawsuit in excess of exemptions will be paid to the Trustee." (Doc. 48.) In their amended plan, the Debtors also proposed to make monthly payments to the trustee over a term of 5 years. However, those payments, as in their original plan, would pay only the Debtors' attorneys' fees, a priority claim for 2007 state income

---

[2] It appears that the Mesh Lawsuit was disclosed for the first time during the meeting of creditors, which led to the amended schedules, the trustee's objection to confirmation, and the amended plan.

2

Case 17-41442-JJR13    Doc 111    Filed 07/12/21    Entered 07/12/21 16:00:13    Desc
Main Document    Page 2 of 13

taxes,[3] and two secured claims—one for a Chevrolet pickup truck and the other for furniture. The court confirmed the amended plan without objection at the hearing on November 7, 2017; the confirmation order was entered on November 9, 2017. (Doc. 56.) Under the confirmed plan, unless the Mesh Lawsuit provided a recovery in excess of the Debtors' exemption, nonpriority unsecured claimholders would receive nothing. However, if the Mesh Lawsuit ultimately provided a recovery above the exemption, that recovery was committed under the plan for the benefit of unsecured creditors.

On April 1, 2021, pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, the trustee filed a motion seeking approval of a compromise (the "Trustee's Motion") of the Mesh Lawsuit. (Doc. 101.) According to the Trustee's Motion, the compromise provided for the defendant in the Mesh Lawsuit to pay $40,000.00—ten times the valuation assigned to the Mesh Lawsuit in the Debtors' amended schedules.[4] The net recovery, after payment of attorney's fees, expenses, and exemption, would be $16,396.50, which under the Debtors' amended plan, would be paid to the trustee for distribution to unsecured creditors. On April 26, 2021, before the hearing

---

[3] The Alabama Department of Revenue filed two claims; claim #24 in the amount of $7,039.55 was filed as a secured claim for 2007 income taxes, and claim #25 was filed as a general, unsecured claim in the amount of $3,549.81 for 2009 income taxes. The delinquent taxpayer on both claims was shown as TWP, and neither indicated JFP was obligated for the unpaid taxes. The confirmed plan (Doc. 48) did not provide for secured claim #24, which was filed on Nov. 6, 2017, the day before confirmation. It appears the Debtors believed the claim would instead be filed as priority. The secured claim was added by a plan modification filed by the trustee on January 11, 2018 (Doc. 67), which added the secured tax claim and changed the plan from a base plan to a zero-percent plan without changing the plan payment.

[4] According to the motion, after payment of attorney's fees, multi-district litigation assessment, and expenses, a net amount of $20,396.50, would be paid to the trustee. And after payment of the Debtors' $4,000 exemption, the balance of $16,396.50 would be distributed under the confirmed plan to pay eligible claims.

on the Trustee's Motion, TWP filed a motion to be dismissed from the Debtors' joint case (the "Motion to Dismiss"), which would leave her husband, JFP, as the sole debtor in their case.

The Trustee's Motion was heard on May 6, 2021.[5] Because the correct procedure had not been followed, the court would not approve the redacted compromise in the Trustee's Motion, but instead asked the trustee to first file a motion asking for permission to seal the unredacted compromise and, assuming no objection, the court would then allow the trustee to file and serve a redacted version of the Trustee's Motion. The Trustee's Motion was withdrawn in open court to allow it to be refiled following the correct procedure.

TWP's Motion to Dismiss was then heard on June 10, 2021. Despite an indication that the Trustee's Motion would be refiled, she had not done so in light the Motion to Dismiss. Inasmuch as TWP wanted to be dismissed from the case, the trustee and TWP's counsel questioned whether court approval of the proposed compromise was necessary, and whether the trustee could collect the compromise proceeds for distribution to creditors pursuant to the confirmed plan. At the hearing, Debtors' counsel informed the court that following her dismissal, TWP intended to use the Mesh Lawsuit proceeds to pay her creditors rather than JFP's, with the money going first to pay her nondischargeable tax debts.

---

[5] Other than the dollar amount of the compromise, the Trustee's Motion, which had not been preceded by a motion to file under seal, redacted the other details including the name of the defendant, description of the cause of action, and did not include the full compromise agreement including any release. The court's procedure in similar matters, which usually occur in chapter 7 cases, requires the trustee to first file a motion asking for permission to file the compromise under seal, setting out the grounds for sealing certain information (usually the defendant's name). The court is provided a full, unredacted copy. The motion to seal, if granted, is then followed by the filing and service of a partially redacted version of the compromise, along with conspicuous language in the compromise motion alerting interested parties that a full, unredacted copy of the compromise is available without cost from the trustee.

4

The Debtors' petition, schedules and exemptions were all jointly filed and their plan was likewise jointly proposed and confirmed. The Debtors, by filing a joint case, made the choice to consolidate their debts, assets, and exemptions, and to propose a plan that offered their creditors the net proceeds from the Mesh Lawsuit without any distinction between JFP's creditors and those of TWP. The only thing that has changed since plan confirmation is the Debtors now know the actual value of the Mesh Lawsuit, and they see an opportunity to collect $20,396.50 rather than their $4,000 exemption and deprive JFP's creditors of their pro rata share of the Mesh Lawsuit proceeds.

At the hearing on the Motion to Dismiss, the court expressed its concern that allowing TWP to withdraw the only asset committed in the joint plan to pay the non-priority unsecured creditors of both Debtors would constitute bad faith. Those creditors, all of whom had been stayed from taking any collection action against either of the Debtors for years, would ironically receive nothing simply because the recovery was greater than originally scheduled. The court took the matter under advisement following the hearing and gave the Debtors an opportunity to submit authorities to address the court's concerns. Nothing further was submitted.

Law and Analysis:

The court considered the matters of record and finds that the Motion to Dismiss should be granted but that the Mesh Lawsuit, for cause, should not vest in TWP upon her dismissal. First, TWP's Motion to Dismiss at this juncture in her case constitutes bad faith to the extent the dismissal seeks to deprive the consolidated estate of the Mesh Lawsuit proceeds. When the Debtors commenced their case, TWP's contingent claim in the Mesh Lawsuit was property of the joint chapter 13 estate. Code § 1306(a). Initially the Debtors failed to disclose the Mesh Lawsuit, but following the meeting of creditors, they amended their schedules to include it as an asset,

claiming its value as only $4,000.00 and claiming that amount as fully exempt.[6] The trustee objected to confirmation unless the Debtors committed the contingent recovery from the Mesh Lawsuit in excess of the exemption to pay the unsecured creditors in the joint case, who otherwise would receive nothing under the Debtors' proposed plan. The Debtors amended their plan to satisfy the trustee's objection, and the objection was then withdrawn (Doc. 53), and the amended plan was confirmed.

The Debtors have enjoyed the protection of the automatic stay for almost four years, and after another 14 monthly payments, they will have completed their plan and be entitled to a discharge of the nearly $88,000 in unsecured debts they originally scheduled plus TWP's delinquent taxes. But now, realizing she can collect $20,396.40 rather than the $4,000.00 exemption from the compromise of the Mesh Lawsuit, TWP wants to be dismissed from the case and take with her the estate's only asset with any value to the unsecured creditors. Removing the Mesh Lawsuit proceeds from the estate would eviscerate the Debtors' joint commitment to contribute the non-exempt proceeds to the plan for the benefit of all their allowed unsecured claimholders. That commitment was the predicate for the trustee's withdrawal of her objection to plan confirmation. Reneging now on the obligation to contribute the nonexempt portion of the Mesh Lawsuit recovery would leave nothing for the unsecured creditors despite the four-year automatic stay protection the Debtors have enjoyed. Moreover, after TWP's dismissal, JFP will remain in the case as the sole debtor and become entitled to a discharge in a few months without any payment to unsecured creditors.

---

[6] It is likely that at the time the Debtors filed their amended schedules they honestly did not know the value of the Mesh Lawsuit.

Code § 1307(b) provides that "[o]n request of the debtor at any time, if the case has not been converted . . . the court *shall* dismiss a case under this chapter." Although the plain language of that subsection of the Code does not condition the ability of a debtor to seek dismissal, some courts have refused to dismiss cases where the dismissal was considered bad faith. *See, e.g., In re Rosson*, 545 F.3d 764 (9th Cir. 2008) (finding implied exception to dismissal as a matter of right if the debtor was engaged in bad faith)). Recently in the case of *Nichols v. Marana Stockyard & Livestock Market, Inc. (In re Nichols)*, 618 B.R. 1 (9th Cir. B.A.P. 2020), the Ninth Circuit B.A.P. discussed the continuing validity of *Rosson* in light of *Law v. Siegel*, 571 U.S. 415 (2014) and *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007). The B.A.P. discussed the ramifications of *Law* and found no abuse of discretion in converting a chapter 13 case to chapter 7 on a creditor's motion under Code § 1307(c) rather than dismissing it on the debtor's motion under § 1307(b) when the court found bad faith or abuse of process. The B.A.P. explained the holistic statutory basis for this result, without resort to Code § 105, and reasoned that the bankruptcy court's discretion when facing a debtor's request to dismiss a chapter 13 case was reinforced, rather than undermined, by the analysis in *Law*:

> The question [in *Marrama*] was whether a debtor's bad-faith conduct was a valid basis for a bankruptcy court to refuse to convert the debtor's bankruptcy from a liquidation under Chapter 7 to a reorganization under Chapter 13. Although § 706(a) of the Code gave the debtor a right to convert the case, § 706(d) "expressly conditioned" that right on the debtor's "ability to qualify as a 'debtor' under Chapter 13." And § 1307(c) provided that a proceeding under Chapter 13 could be dismissed or converted to a Chapter 7 proceeding "for cause," which the Court interpreted to authorize dismissal or conversion for bad-faith conduct. In light of § 1307(c), the Court held that the debtor's bad faith could stop him from qualifying as a debtor under Chapter 13, thus preventing him from satisfying § 706(d)'s *express condition* on conversion.

*Nichols,* 618 B.R. at *9 (quoting *Law,* 571 U.S. at 425-426) (citations omitted). The Ninth Circuit B.A.P. explained that reading the Code holistically, as *Law* did, required that both Code sections

7

be given effect (and the bankruptcy court be given discretion) in the scenario where a conversion motion alleging bad faith or abuse of process meets a debtor's motion to dismiss:

> When those situations converge with competing conversion and dismissal motions, each subsection should be given its proper significance. Section 1307(c) proffers a statutory basis to refuse to honor a § 1307(b) dismissal request, just as §§ 706(d) and 1307(c), read together, proffer a statutory basis to refuse to honor a § 706(a) conversion request.

*Nichols*, 618 B.R. at *10.

The B.A.P. also recognized that although the Ninth Circuit had not directly addressed the issue in the chapter 13 context after *Law*, it had expressly relied upon the continuing validity of *Rosson* in the chapter 12 context:

> More importantly, after *Law,* the Ninth Circuit in *Clark v. DeVries (In re Clark)*, 652 F. App'x 543 (9th Cir. 2016) relied on *Rosson* in holding that a chapter 12 debtor did not have an absolute right to dismissal under § 1307(b)'s chapter 12 analog, § 1208(b), because the district court had the power to instead convert the case to chapter 7 pursuant to § 1208(d), which provides that a court "may" dismiss or convert a case "upon a showing that the debtor has committed fraud in connection with the case."

*Nichols*, 618 B.R. at *10.

The most recent court of appeals to consider the issue reached the opposite conclusion. The Sixth Circuit in *Smith v. U.S. Bank Nat'l Ass'n (In re Smith)*, --- F.3d --- (6th Cir. 2021), held that a chapter 13 debtor had the absolute right to dismiss her chapter 13 case regardless of the circumstances, including bad faith, because *Law* says that § 105 cannot be used to circumvent § 1307(b)'s directive that the court "shall dismiss" a chapter 13 case (if not converted previously) upon the debtor's request at any time.[7] The Sixth Circuit focused on *Law*'s statement that § 105

---

[7] In *Nichols*, 618 B.R. at *10, the Ninth Circuit B.A.P. discussed Code § 1307 as a "statutory safeguard . . . to ensure that chapter 13 cases are purely voluntary proceedings" and quoted the House Report wherein Congress stated its concern that a mandatory or involuntary chapter 13 (at that time "Chapter XIII") might constitute involuntary servitude and thus violate the Thirteenth Amendment. *Id.* (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 120 (1977), *as*

could not be used to "disregard the code's provisions when they lead to results that seem unfair." *Id.* at *3. In contrast to the Ninth Circuit B.A.P., which read § 1307(c) as a statutory limit on § 1307(b) without resort to inherent authority or to § 105(a), the Sixth Circuit conversely held that the "shall" in § 1307(b) must always overcome the "may" in § 1307(c) as a matter of statutory mandate. The Sixth Circuit also said that *Law*'s import is that the bankruptcy court is powerless to invoke its statutory authority under §105(a) to change that result ("shall" beats "may") even in the face of bad faith or abuse of process. The Sixth Circuit understood *Law* as having limited *Marrama*'s application to a narrow range of circumstances where the bankruptcy court could use its statutory authority under § 105(a) to ignore inefficient procedural steps to reach the ultimate result required by the Code. *Id.* The Sixth Circuit's ruling means that a debtor who has not previously converted the case may use § 1307(b) as an automatic escape hatch in response to a motion under § 1307(c) even when the "cause" for the motion under § 1307(c) is bad faith or abuse of process. Although it is not necessary for the court to decide this issue to resolve the matters before it (because the court is not faced with a motion to convert), the court is nonetheless persuaded by the reasoning of the Ninth Circuit B.A.P. in *Nichols*, in the absence of controlling Eleventh Circuit authority.

Even if the right to dismiss a chapter 13 case (or as in the instant case, the right of one debtor to be dismissed from a joint chapter 13 case), were absolute despite bad faith or abuse of process, that right does not mean the dismissed debtor also has an absolute right to reclaim an

---

*reprinted in* 1978 U.S.C.C.A.N. 6080 (footnotes omitted)). As a practical matter, even in the absence of an unqualified right to dismiss, every chapter 13 case is entered into voluntarily and chapter 13 debtors cannot be compelled to work for their creditors because a debtor may simply stop making plan payments from future income to the trustee, which is true even if the court does not permit dismissal, or as in the instant case, allows the voluntary dismissal but orders the retention of estate assets for cause due to bad faith or abuse. However, the issue here is not dismissal of the case—it is the dismissal of one of the two joint debtors from the case.

9

estate asset that has proved to be more valuable than believed when the asset was committed to the chapter 13 plan. To this point, Code § 349(b)(3) provides, "Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title . . . revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title."

*In re Darden*, 474 B.R. 1 (Bankr. D. Mass. 2012), is persuasive. In that case, the chapter 13 debtor's confirmed plan, as modified, provided for a 20% distribution to unsecured claimholders, as well as a pro rata distribution of nonexempt proceeds from postpetition lawsuits when those proceeds were received by the debtor and upon resolution of the litigation. The debtor received settlement proceeds from one lawsuit, but not all, and wanted to hold all the funds, including the non-exempt portion, until all the litigation was settled. The chapter 13 trustee moved for immediate turnover of the nonexempt settlement proceeds and pointed out that the plan term had expired and payments were in default. In response, the debtor moved to voluntarily dismiss her case, arguing that the plan language allowed her to keep the proceeds until all litigation was settled and that in the meantime, she had the right to dismiss her case and have the proceeds automatically revest in her. The debtor argued equity supported her position because the creditors could pursue her under state law in the absence of her discharge, which she would forego with the dismissal. *Id*. at *5-*7.

The bankruptcy court began by noting that the settlement proceeds were estate property under Code §§ 541 and 1306(a)(1), because the debtor had a legal and equitable interest in the settlement proceeds, even though debtor's counsel had not disbursed the funds. Although the settlement proceeds in *Darden* were for a postpetition cause of action, the court analyzed the effect of dismissal on the vesting of the cause of action under § 349(b)(3) and found that cause existed

to "order otherwise" and not allow re-vesting in the debtor. *Id.* at *12. The parameters of "cause" under Code § 349(b)(3) are not defined statutorily but must instead be determined by the court using equitable measurements, and although bad faith can provide "cause" to avoid re-vesting, "cause" can exist even in the absence of bad faith. According to the *Darden* opinion:

> Cause under § 349(b) may also arise in situations where a party has not acted in bad faith. Courts have also found cause in circumstances where, in view of the duration of the time in which the debtor enjoyed the benefit of the automatic stay, it would be inequitable to creditors to authorize dismissal without distribution of monies accumulated during the case for payment to them, the quid pro quo for their having suffered the effects of bankruptcy's automatic stay.

*Id*. at *13. The court in *Darden* also rejected the argument that the creditors were not harmed by allowing the proceeds of the estate's cause of action to vest in the debtor at dismissal because the tradeoff was that the debtor would not receive a discharge and the creditors could pursue her under state law after dismissal:

> Although the Debtor sees this as fair because those debts will not be discharged, the Bankruptcy Code should not tolerate such an inequitable result. In exchange for five years of bankruptcy protection, during which time all creditors were stayed from taking collection action against her, the Debtor promised a twenty-percent dividend and the proceeds, if any, from the State Court Action.

*Id.* at *14. To avoid an abuse and do equity, the court then granted the trustee's motion for turnover, granted the debtor's motion to dismiss, and ordered that the trustee disburse an amount equal to the settlement proceeds to the unsecured creditors. *See also Viegelahn v. Lopez (In re Lopez)*, 897 F.3d 663 (5th Cir. 2018) (acknowledging that the bankruptcy court may deny vesting in the debtor at dismissal for cause, without deciding whether bad faith is a prerequisite to such cause; but allowing a debtor to keep nonexempt homestead proceeds upon dismissal because the bankruptcy

11

court told the debtor that she could keep the money if she decided to dismiss her case, and the debtor used some funds from the sale of the property to fund the plan for some time).[8]

In the instant case, the court is not confronted with a situation where there will be no operative plan under which the trustee may disburse the funds. To the contrary, the case will remain active notwithstanding the dismissal of TWP from the case, and the confirmed plan, which requires the Mesh Lawsuit proceeds be contributed for the benefit of both JFP's and TWP's unsecured creditors, remains effective. JFP will continue to enjoy the benefit of the automatic stay and a future discharge. Should JFP default and the trustee move to dismiss, or should JFP move to be voluntarily dismissed, the court would be inclined to retain the Mesh Lawsuit proceeds for distribution to allowed unsecured claimholders under Code § 349(b)(3) as a condition of dismissal for the same reasons that it is retaining them upon the dismissal of TWP—to avoid an abuse of the bankruptcy system that would result if the court allowed the stay to have been enjoyed for years, based on the confirmation of a plan that offered the nonexempt Mesh Lawsuit proceeds to the unsecured creditors. It is bad faith to have reaped that benefit for so long but then seek to extract the proceeds from the estate when the only change in circumstance is that the proceeds are greater than originally claimed as exempt.

Here, the court need not decide if TWP should be allowed to be dismissed from the case despite having acted in bad faith in attempting to keep the only valuable estate asset from the creditors four years into the case and after discovering its value greatly exceeded her expectations.

---

[8] The Fifth Circuit in *Lopez* also reiterated its holding in *In re Jacobsen*, 609 F.3d 647 (5th Cir. 2010), which is in agreement with the Ninth Circuit, that a bankruptcy court has discretion to limit the otherwise absolute right of a debtor to dismiss under § 1307(b) if the court finds bad faith conduct or abuse of the bankruptcy system. 609 F.3d at *672 n.11. This is significant because *Lopez* was decided several years post-*Law*.

12

Case 17-41442-JJR13    Doc 111    Filed 07/12/21    Entered 07/12/21 16:00:13    Desc
Main Document    Page 12 of 13

Instead, the court will allow the dismissal of TWP, but the court will exercise its discretion under Code § 349(b)(3) to limit the re-vesting of property in TWP post-dismissal.

<u>Conclusion:</u>

Cause exists under Code § 349(b)(3)— to the extent it applies upon the voluntary dismissal of one joint debtor but not dismissal of the entire case—for the Mesh Lawsuit proceeds to not re-vest in TWP upon her dismissal from the case. Instead, the Mesh Lawsuit proceeds will remain property of the bankruptcy estate and should be paid directly to the trustee once the settlement is formally approved, with the funds then distributed jointly to TWP and JFP to the extent exempt, and then to the general unsecured creditors with allowed claims as of the date of TWP's dismissal.

This result is necessary to mitigate what would otherwise be bad faith, to do equity, and to avoid an abuse of the bankruptcy process. It would be an abuse to allow TWP to withdraw the only asset of any value for the creditors from the estate simply because the asset is more valuable than she believed it to be four years ago when she and JFP committed the asset to their creditors in their amended, joint plan, which could not have been confirmed without that commitment.

In light of the court's decision, it will allow TWP twenty-one days from the date of this Opinion and Order to reconsider her Motion to Dismiss and for the trustee to follow the correct procedure for permission to file the compromise under seal and seek approval of the Mesh Lawsuit compromise, if the same is to again be redacted.

It is so ORDERED this 12th day of July 2021.

/s/ James J. Robinson<br>
JAMES J. ROBINSON<br>
CHIEF U.S. BANKRUPTCY JUDGE